UNITED STATES v. HAVILAND & CO.

(Circuit Court, S. D. New York. January 19, 1909.)

No. 5,034.

1. CUSTOMS DUTIES (§ 75*) — APPRAISAL — "PRINCIPAL MARKET" — LIMITED SALES.

In Customs Administrative Act June 10, 1890, c. 407, § 19, 26 Stat. 139 (U. S. Comp. St. 1901, p. 1924), the provision that dutiable value shall be the market value "in usual wholesale quantities, at the time of exportation to the United States, in the principal markets of the country from whence imported," refers to the "principal market" where imported merchandise is bought and imported to the United States in wholesale quantities, rather than to markets where there may have been limited purchases.

[Ed. Note.—For other cases, see Customs Duties, Cent. Dig. §§ 183–185; Dec. Dig. § 75.*]

2. CUSTOMS DUTIES (§ 75*)—APPRAISAL—EXPORT PRICE—"PRINCIPAL MARKET."

The entire output of a china manufacturer in Limoges was exported to the United States directly from Limoges, except a small amount of special classes, which was disposed of in Paris to European trade; the wholesale business in Paris being less than 4 per cent. of said exportations to the United States. *Held*, that for the goods shipped to America Limoges, and not Paris, was the "principal market," within the meaning of Customs Administrative Act June 10, 1890, c. 407, § 19, 26 Stat. 139 (U. S. Comp. St. 1901, p. 1924).

[Ed. Note.—For other cases, see Customs Duties, Cent. Dig. § 183; Dec. Dig. § 75.*]

3. CUSTOMS DUTIES (§ 75*)—APPRAISAL—"CONDITION."

Where practically all the output of a china manufacturer was sold to the United States, special classes manufactured for European trade cannot be said to be in "condition" to supply the American trade, within the meaning of Customs Administrative Act June 10, 1890, c. 407, § 19, 26 Stat. 139 (U. S. Comp. St. 1901, p. 1924), providing that dutiable value shall be determined according to the "condition in which * * * merchandise is there bought and sold for exportation to the United States."

[Ed. Note.—For other cases, see Customs Duties, Dec. Dig. § 75.*]

4. CUSTOMS DUTIES (§ 85*)—REAPPRAISEMENT—REVIEW ON PROTEST.

Though, under Customs Administrative Act June 10, 1890, c. 407, § 13, 26 Stat. 136 (U. S. Comp. St. 1901, p. 1932), a reappraisement by a Board of General Appraisers is "final and conclusive," it may be impeached, if based upon a wrong principle or contrary to law, or the power conferred by statute has been transcended; and where such board misinterprets a portion of the evidence, a legal error has been committed.

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

making it necessary to see if the error works injustice, and proceedings for review may be initiated by protest under section 14 of said act.

[Ed. Note.—For other cases, see Customs Duties, Cent. Dig. § 201; Dec. Dig. § 85.*]

On Application for Review of a Decision by the Board of United States General Appraisers.

The decision below is reported as G. A. 6,655 (T. D. 28,382).

D. Frank Lloyd, Asst. U. S. Atty.

B. A. Levett (Henry A. Wolff, on the brief), for importers.

MARTIN, District Judge. The merchandise in question is Haviland china. The local appraiser advanced the importers' invoice prices for duty. The importers appealed, under Act June 10, 1890, c. 407, § 13, 26 Stat. 136 (U. S. Comp. St. 1901, p. 1932), and the case went before a single General Appraiser (Judge Waite), who found its entered value correct. The government then appealed to a board of three General Appraisers, called in the record "Board No. 2." This board advanced the goods 16.5 per cent. above the entered value, and liquidation was made on that basis. Thereupon the importer appealed to a board of three General Appraisers by protest, under section 14 of said act. Board No. 3 sustained the protest, and held that the decision of Board No. 2 was illegal. From this decision the government appeals to this court, under section 15 of said act.

At the time of the importations in question there were three houses known as Haviland & Co.—one house at Limoges, France, which manufactured china; another at New York, a wholesale house, which supplies the trade in the United States and Canada; and a third in Paris, France, a selling house for European trade. Each house is a partnership, and the head of each firm is Mr. Charles Edward Haviland. The remaining partners are not all the same. The main business of the Limoges house is the supplying of china to the New York house. Its sales are exclusively to New York and Paris. All the sales of the New York house are wholesale, while the Paris house is partly retail, dealing in other goods as well as those of Haviland & Co., and selling a small quantity at wholesale. There are a number of other manufacturers of china at Limoges, whose goods are similar in character to those of Haviland & Co., there being altogether 36 manufacturers, 25 decorators, and 21 commissionaires, all engaged in the manufacture or sale of china similar to Haviland's, and they sell in the open markets to buyers, many of whom ship to the United States. Prior to 1905 controversies between importers and the government had arisen with reference to the market value. Attempts had been made to come to an agreement as to the invoice value of importations of china. Various investigations had been made by the government at different periods. In 1905 there was an especial effort made to establish the foreign market value of these goods. There was then a reappraisement, known as "No. 3,843," that was confirmed by the Board of General Appraisers. It was then understood that those prices were the fair foreign market value; but there was a discrimina-

tion of 5 per cent. against the Haviland goods, or, in other words, their value was increased 5 per cent. because of their reputation in the trade.

There was no evidence of any material change in the general market price of these goods since that time. The prices then fixed, with the exception just stated, applied to all china coming from Limoges, by whomsoever manufactured. An effort was made in 1906 on the part of Haviland & Co., of New York, to be relieved of this 5 per cent. discrimination, but they did not succeed. There was then no attempt, however, on the part of the government, to advance the price. Yet in the latter part of that year the importations by Haviland & Co., of New York, invoiced at the same prices as theretofore, were advanced, and every cask containing their imported china was seized for alleged fraudulent undervaluation, and for several months none was allowed to pass through the customhouse of New York.

The record of the hearings in this cause shows that the only persons examined as witnesses who had actually bought for the genuine purpose of importing china from France to the United States were as follows: Adolph Barroutaud, of the firm of Barroutaud & Watson, importers of French china for 14 years; Henry Creange, an importer of china for 16 years; Herman Siegel, a member of the firm of L. Straus & Co., connected with this business 25 years, in charge of the import department, including French china, frequently called by the Board of General Appraisers to give values of china; Max O. Doerring, a member of the firm of Charles Ahrenfeldt & Sons, importers of French china since 1891; Ernest Waeldin, of the firm of George Bassett & Co., importers of china and glassware, and the European buyer since 1890; B. Rosenfeldt, importer of china for 15 years; and Lucien D. Bloch, of the firm of Lucien D. Bloch & Co., importers of French china for 5 years. These witnesses testified that Limoges is the only market where they buy, and is the market for the buying of china for importation to the United States; that the china that they buy is of an average quality with that of Haviland & Co.; and they gave a list of prices which they have paid and are paying, which on an average is below the prices given by Haviland & Co. in their invoices for tariff duty.

It is contended by the government, however, that the Havilands of New York are substantially the same firm as Haviland & Co. who manufacture the china at Limoges and the Haviland & Co. who sell at wholesale and retail in Paris, and that, as they sell to no one else in Limoges and do sell in Paris, the prices in Paris must control. The evidence shows that the manufacture of china by Haviland & Co. in Limoges was developed for the sole purpose of supplying the American market, and that Haviland & Co., of New York, furnish the wholesale market of the Haviland china for this country. Special classes of goods for the foreign trade are also manufactured at the Limoges factory, when the trade in this country is not in a condition to take the full output of the factory. The Paris house takes that excess, which is but a small proportion of the output of the plant. The Paris house also buys from other manufacturers as their European

trade demands. It appears that the total wholesale business of the Paris house is less than 4 per cent. of the total importations to the United States from the Limoges house. Some of the other manufacturers in Limoges maintain agencies in Paris; but it does not appear that they have any other duty than to transmit orders to Limoges. The price charged to the Paris trade by the manufacturers at Limoges includes a profit, and the sales at Paris must cover that profit, also the expense of shipment, breakage, rent, and the like. It is not disputed that prices in Paris are considerably higher than in Limoges. It is self-evident, therefore, that any intelligent importer would buy at Limoges.

The evidence fairly shows that the principal wholesale market of china in France is Limoges. It is evident that the reason that Haviland & Co., of Limoges, sell to no other importer than Haviland & Co., of New York, is that Haviland & Co., of New York, desire to control the American trade in their goods, which is legitimate. The fact that the Limoges house sells to the Paris house a limited quantity for retail and wholesale in Europe of a class of goods made for the European trade, under the circumstances developed by the evidence, is not sufficient upon which to find that the Paris market should be established as the basis of ad valorem tariff duty. There is no substantial evidence that the importers in the case at bar, in their relations with the manufacturing house at Limoges, have adopted prices of invoice on the basis of a purchase price that is fraudulent, dishonest, or even unfair. The history of previous transactions by these importers, their negotiations with the government heretofore, and the prices paid by other importers to other manufacturers of china at Limoges negative such an inference.

I concur with Board No. 3 in their view of the Haviland letter. The opinion of the board is so carefully and ably written that I need not add anything in the discussion of that question. I do not concur in the decision of Board No. 3 in affirming Board No. 2 as to the adoption of the Paris wholesale prices for the duty to be imposed upon the merchandise in question. Board No. 2 based its decision upon the Haviland letter, misinterpreted its contents, and thereby committed a legal error. Therefore it becomes necessary to look into all the evidence before them to see if that error works injustice. I have read the evidence with great care, including nearly 200 pages of briefs of counsel, and I concur with Judge Waite in finding Limoges to be the principal wholesale market of china from which importations are made to the United States. As bearing upon this question, the position taken by the government in its recent German agreement (T. D. 28,215, 28,216) is pertinent. It reads as follows:

"Market values as defined by section 19 of the customs administrative act (26 Stat. 139 [U. S. Comp. St. 1901, p. 1924]), shall be construed to mean the export price whenever goods, wares, and merchandise are sold wholly for export, or sold in the home markets only in limited quantities, by reason of which facts there cannot be established a market value based upon the sale of such goods, wares, and merchandise in usual wholesale quantities, packed ready for shipment to the United States."

167 F.—27

That stipulation fits the case at bar. There is no reason why the principle adopted as to importations from Germany should not be adopted as to importations from France.

It is contended by counsel for the government that the importations in question antedated the German agreement. I understand that to be so, but that does not affect the principle at all. If the claimed error of Board No. 2 was that said board had not given the same construction to section 19 of the customs administrative act of 1890 that the Treasury Department gave in this German agreement, and therefore erred in applying the facts found to said section 19, then the date of said agreement, being subsequent to the importations in question, might be material. Section 19, as it affects these questions, reads as follows:

"That whenever imported merchandise is subject to an ad valorem rate of duty * * * the duty shall be assessed upon the actual market value or wholesale price of such merchandise as bought and sold in usual wholesale quantities, at the time of exportation to the United States, in the principal markets of the country from whence imported, and in the condition in which such merchandise is there bought and sold for exportation to the United States, or consigned to the United States for sale. * * * That the words 'value' or 'actual market value,' whenever used in this act or in any law relating to the appraisement of imported merchandise, shall be construed to mean the actual market value or wholesale price as defined in this section."

The above provision as to market value where the merchandise is bought "in usual wholesale quantities" at the time of the exportation has a meaning. The words "in the principal markets of the country from whence imported" have a meaning. These words mean the principal market where the imported merchandise is bought and imported to the United States in wholesale quantities. They cannot fairly be construed to mean that special agents of the Treasury Department may, by searching France, find some place where there have been some purchases at wholesale at a higher price than in the principal market, and a Board of Appraisers adopt that as a basis of valuation. In the language of Judge Lacombe, in United States v. Godillot & Co., 139 Fed. 1, 71 C. C. A. 505, T. D. 26,272, "not some varying local value prevailing in some of its individual cities." Board No. 2 seems to have given no effect to the words "and in the condition in which such merchandise is there bought and sold for exportation to the United States." The "condition" is as pertinent, under this act, as are sales in the markets. The word "condition" has a meaning—"state of being; quality; situation in relation to environment; attribute or characteristic." The evidence fairly shows that practically all the goods manufactured by Haviland & Co. at Limoges that were in a "condition" to supply the American trade were bought by the New York house at Limoges, and from Limoges exported to the United States.

It is claimed by the government that the decision of Board No. 2 is final. The language of section 13 of said act, which has reference to said Board No. 2, is as follows:

"Which board shall examine and decide the case thus submitted, and their decision, or that of a majority of them, shall be final and conclusive as to the dutiable value of such merchandise against all parties interested therein."

If the record showed that Board No. 2 considered all the evidence before them, and from it found certain facts, and there was some evidence to sustain those facts, the court would not review it, nor sustain Board No. 3 in reviewing it. That is not the question here presented. Board No. 2 erred upon a question of law by adopting a wrong principle in the interpretation of a written document, the result of which would work injustice to these importers. It, therefore, was the plain duty of Board No. 3 to correct it, and it is the duty of this court to sustain that board in so doing. Notwithstanding the language of said section 13, the courts have repeatedly held that where the appraisement was based upon a wrong principle, contrary to law, or has transcended the power conferred by statute, such action is subject to review and may be impeached. United States v. Passavant, 169 U. S. 16, 18 Sup. Ct. 219, 42 L. Ed. 644; Erlanger v. United States (C. C.) 152 Fed. 576; Hermann v. United States (C. C.) 84 Fed. 151; United States v. Muller (C. C.) 152 Fed. 575; United States v. Godillot & Co., 139 Fed. 1, 71 C. C. A. 505; Lace House v. United States, 141 Fed. 869, 73 C. C. A. 403.

The Circuit Court of Appeals for this circuit, in Gulbenkian & Co. v. United States, 153 Fed. 858, 83 C. C. A. 40, upon examination of the record found that the appraised value of imported wool was based upon the actual value of white overcolored wool, and thus the invoiced valuation was increased for tariff duty, when the market value of each kind of wool, colored and white, was the same when it was bought in the principal markets of Bagdad, Turkey, and imported here. The Court of Appeals there held that the appraisement for duty, having been based upon the value of the wool in question in other markets than the market from which it was imported, was an error; and, notwithstanding the provision of section 13 that the appraisement shall be final, it was reviewed by the court, and impeached, because the action of the appraisers was not within the letter of the law. The same principle is applicable to the case at bar.

The decision of Board No. 3 is affirmed.