ADOLPH GOLDMARK & SONS CORP. *v.* UNITED STATES (No. 3783)[1]

---

[1] T. D. 47378.

United States Court of Customs and Patent Appeals, November 13, 1934

*Sharretts & Hillis* (*Edward P. Sharretts* of counsel) for appellant.

*Joseph R. Jackson*, Assistant Attorney General (*Charles D. Lawrence*, Special Assistant to the Attorney General; *Daniel I. Auster*, special attorney, of counsel), for the United States.

[Oral argument October 12, 1934, by Mr. Sharretts and Mr. Lawrence]

Before GRAHAM, Presiding Judge, and BLAND, HATFIELD, GARRETT, and LENROOT, Associate Judges

BLAND, Judge, delivered the opinion of the court:

Importer has here appealed from the decision of the United States Customs Court, Third Division, affirming that of the single judge sitting in reappraisement, holding the dutiable value of 119⅞ gross of fruit preserves, imported from England, to be the foreign market value, which consisted of the unit invoice prices less 2½ per centum discount, plus "packing", as appraised, and not the unit invoice prices less 7½ per centum discount, plus "packing", as claimed by the importer.

It is conceded that there is no question of export value. The sole issue in the case is: Does the foreign value consist of the unit invoice prices, less a discount of 2½ per centum, or is it the unit invoice prices less a discount of 7½ per centum?

The evidence in the case consists of the testimony of Stephen Oswald Chivers, a director of the exporting concern, who was the sole witness in the case, testifying for the importer, and a report of C. R. Clark, assistant Treasury attaché, London, England, introduced by the Government.

The evidence shows that on the date of exportation of the goods in question, all sales of this merchandise were made at list prices, less varying discounts, depending on the quantities purchased and frequency of orders and that sales in wholesale quantities are made to four classes of purchasers in England at the discounts shown:

1. Concerns who resell to retail stores: 7½ percent. (These are called wholesalers by the witness and correspond to our jobbers.)

2. Retail stores: 2½ percent.

3. Concerns that resell to retail stores and also sell at retail, that is direct to consumers: 5 percent. This group is called semiwholesalers.

4. "Company shops" (chain stores): 7½ percent.

The testimony shows that there are approximately 1,100 stores of the first class scattered all over England; that they place an order approximately every two weeks for about 10 to 15 gross of one-

pound jars like the goods on the involved invoices; that the minimum would be five gross; that there are about 23,000 stores of the second class and that they buy probably every three to four weeks in quantities of about 2 to 3 gross; that the third class orders about as frequently as the first class but in quantities one-third less—7 to 12 gross (the number of such dealers is not given); that the fourth class buys regularly in as large as or larger wholesale quantities than the first class; that the number of these dealers compared with the number of those of the first class is very small.

The witness stated that about 38 per centum of the trade consists of wholesalers (including in this figure the chain stores); 11 per centum consists of semiwholesalers, and 51 per centum consists of retailers.

To sum up, there are three discounts:

7½ per centum. Given to wholesalers and retailers who regularly place orders in the same quantities as wholesalers.

5 per centum. Given to semiwholesalers.

2½ per centum. Given to retailers.

The witness testified that his firm would not give the 7½ per centum discount to any retail store unless "we knew we should have orders for that quantity regularly", that is, that 7½ per centum would not be given to a purchaser of a year's supply—"it would have to be in the regular order of business".

While the testimony of the witness is, for the most part, in the present tense, he must have had in mind the date of exportation of the involved merchandise.

Upon the foregoing statement of facts we conclude that the single judge sitting in reappraisement and the United States Customs Court, Third Division, correctly held that the price at which the involved merchandise was sold to the retail stores at a discount of only 2½ per centum, plus packing, was the proper dutiable value of the imported preserves.

Section 402 (c) of the Tariff Act of 1930 reads in part as follows:

SEC. 402 (c). FOREIGN VALUE.—The foreign value of imported merchandise shall be the market value or the price at the time of exportation of such merchandise to the United States, at which such or similar merchandise is freely offered for sale to all purchasers in the principal markets of the country from which exported, in the usual wholesale quantities and in the ordinary course of trade * * *.

One of the contentions of the importer here is that we should hold that the sales to the 1,100 wholesalers who received a 7½ per centum discount should be accepted as proof of the market value for the reason that it was held in In re Three Thousand One Hundred and Nine Cases of Champagne, Fed. Cas. No. 14012 (D. C. N. Y. 1867), that the market value is the lowest cash price offered by manufacturers to regular customers in the ordinary course of trade for merchandise in wholesale

quantities. We also think appellant's contentions lead to the conclusion that the larger quantity should be accepted since it compares more favorably with the quantity of the importation.

The questions presented in this case are not new to this court and we think they have been decided by us adversely to the contentions of appellant.

The price to be accepted as an element of foreign value must be a price at which such or similar merchandise, at the time of exportation of the merchandise involved, is freely offered for sale to all purchasers in the principal markets in England in the usual wholesale quantities and in the ordinary course of trade. In the case at bar it is clearly shown that everyone could not receive the 7½ per centum discount unless they were in a position to buy in certain large quantities regularly. One could not buy even a very large quantity and get the 7½ per centum discount unless such orders came regularly. This, we think, was a restriction upon the sales so as not to bring the sales price within the language of said section 402 (c), *supra*. *United States* v. *A. W. Faber, Inc.*, 21 C. C. P. A. (Customs) 290, T. D. 46819, and authorities cited; *United States* v. *H. W. Robinson & Co., et al.*, 19 C. C. P. A. (Customs) 274, T. D. 45436.

In the *Faber* case, *supra*, it was said, referring to the case of *United States* v. *Hammel, Riglander & Co. et al.*, 16 Ct. Cust. Appls. 37, T. D. 42716:

It appears from the foregoing that the watch crystals there involved were not freely offered for sale to all purchasers in the usual wholesale quantities, and in the ordinary course of trade, at a discount of 15 per centum from the list price, but that such offers and sales were limited to those who would agree to make purchases aggregating a minimum amount during a year.

We have carefully considered the opinion in said case, and are now convinced that the court was in error in holding that a discount allowed under the facts there found could be considered in arriving at either foreign or export value.

The above holding would seem to be sufficient to end the controversy at bar, but another aspect of the case appeals to us as being an additional and very weighty reason why the judgment of the Customs Court should be affirmed. We have on several occasions held that the major portions of the sales or offers for sale in wholesale quantities should be the criterion. *United States* v. *Richard & Co.*, 15 Ct. Cust. Appls. 143, T. D. 42216; *G. W. Pleissner* v. *United States*, 16 Ct. Cust. Appls. 507, T. D. 43237; *United States* v. *M. Minkus*, 21 C. C. P. A. (Customs) 382, T. D. 46912.

Not only does this record show that the sales of preserves of the English manufacturer in the English market to retail stores for resale were greater in number than the sales to all other classes of purchasers, but it is also shown that the greater volume of trade was with said retail stores. Moreover, everyone could buy at the same price at a discount of 2½ per centum, and there was no limit or restriction as to

the quantity to be taken. It is not disputed that the quantities in the sales to these 23,000 retail dealers were wholesale quantities. Unquestionably such sales were in the ordinary course of trade.

Appellant in its brief has raised some question about the "principal market" and states:

\* \* \* Where, as is true in the present case, there is a substantial wholesale trade of 1,100 establishments buying regularly and in uniform quantities and at the same price, it would defy reasonable construction to hold that the statute requires appraising officers to search through every hamlet and cross-roads village of the country of exportation for the purpose of counting the number of sales to retail stores in minor quantities at higher prices, and if such sales outnumber the sales to the wholesalers, to adopt them as evidence of market value. A more reasonable view is that transactions with the wholesalers constitute the "principal market" rather than transactions in minor quantities with *retail stores scattered throughout the country.* (Italics ours.)

Appellant cites *United States* v. *Haviland & Co.*, 167 Fed. 414, as being in point on this question.

It is difficult for us to determine just what appellant means by the above-quoted language. Certainly it is not necessary to go to the retail stores scattered throughout England to find the price of sales to them any more than it would be necessary to go to the 1,100 wholesalers or jobbers who also are evidently scattered throughout England, in order to find what they pay in the sales made to them. As far as this record shows, all the sales are made from the same place and the principal market is where these sales were made to the various purchasers hereinbefore enumerated.

The judgment of the United States Customs Court is *affirmed.*